## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-00195 (RCL)** |
| **CORINNE MONTONI** | |
| **Defendant.** | |

### <u>UNITED STATES' SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Corinne Montoni to 3 months of incarceration, in the middle of the advisory guideline range, 36 months of supervised release, $2000 in restitution, and the mandatory special assessment of $100.

### I.    INTRODUCTION

The defendant, Corinne Montoni, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary

Montoni, a resident of Florida, entered the Capitol through the broken Senate Wing Door. She advanced with a crowd of other rioters through a hallway of the Senate Wing of the Capitol, and she joined in pushing against police officers who were trying to stop them.   She enthusiastically encouraged fellow rioters with shouts of "Push back! Push back!" and used her phone to record video which she posted on social media.   After exiting the building, she re-entered despite knowing that the police were attempting to remove all rioters.   An adept social media user, Montoni posted messages on Instagram, Facebook, and Parler that promoted and glorified violent insurrection at the Capitol on January 6th.   She advocated the forcible removal of members of Congress and Vice President Pence, saying, among other things,

> **"We do not want civilians. We do not even want most of the cops.**
> **We want the TRAITOR POLITICIANS. This is not civil war.**
> **This is a revolution."**

The United States recommends that the Court sentence Montoni to 3 months of incarceration for her violation of 18 U.S.C. § 231(a)(3).   The sentence is within the advisory Guidelines' range of 0-6 months, which the government submits is the correct Guidelines calculation.   A 3-month sentence reflects the gravity of Montoni's conduct, but also acknowledges her early admission of guilt.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The United States refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 72, for a short summary of the January 6, 2021 attack on the United States Capitol

---

($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.    Montoni's Role in the January 6, 2021 Attack on the Capitol**

**a.   Social Media Posts Prior to January 6th**

For several months leading up to her arrival in Washington, D.C., Montoni had been engaged in frequent communication on social media with ideologically like-minded others. During that time period, Montoni posted videos and vitriolic messages on social media advocating for and glorifying political violence.   They reflected a fervor and an enthusiasm for violent insurrection.   At the time, she was an avid follower of talk show host, Alex Jones, and his protégé, INFOWARS contributor, Owen Shroyer.[2]   Montoni also followed several Proud Boys accounts on Parler (including one of the group's leaders, Joseph Biggs) and had interacted socially with several members on previous visits to Washington, D.C.   She looked forward to encountering Antifa members in Washington, D.C., and to having physical clashes with them.

On December 16th, she posted this message to her Parler account:

> **"Insurrection Act coming in hot.. void the fraudulent 2020 election, arrest these traitors and restore order and faith in our justice department. GitMo is readyyyyyyy"**

On December 25th, she had the following exchange with a Facebook friend:

> **Author** Corinne Montoni (Facebook: ███████)
>
> **Sent** 2020-12-25 18:08:40 UTC
>
> **Body** It better be a Trump victory party
>
> **Author** ████████ (Facebook: ██████████)

---

[2] Owen Shroyer was recently sentenced in another January 6th prosecution to 60 days on one count of Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1).   *United States v. Jonathon Owen Shroyer*, Case No. 21-cr-542 (TJK).

**Sent** 2020-12-25 18:09:03 UTC

**Body** Or were going to fucking WAARRRRR party

**Author** ███████ (Facebook: ███████████)

**Sent** 2020-12-25 18:09:06 UTC

**Body** Wooh!

**Author** Corinne Montoni (Facebook ████████)

**Sent** 2020-12-25 18:09:08 UTC

**Body** Yuppppp

On December 28th, MONTONI posted to her Parler account this message:

> **"If Pence betrays us, we riot."**

The next day, she posted,

> **"January 6th in DC is going to be YUGEEEE! It's either going to be a Trump victory party or the first real day of the revolution. Who's going?!"**

The day before the riot, on January 5th, she posted this to her Parler account:

> **"DC bound see ya there Revolutionists!"**

### b.  Montoni's Breach of the Capitol Building

On January 5, 2021, Montoni flew from Florida to Baltimore, MD, and then took a train into Washington, D.C.   The next day, January 6, 2021, Montoni attended the "Stop the Steal Rally."   Following the rally, she walked with a friend to the Capitol.[3]   Once on Capitol grounds, she paused to take a selfie video and post it on Parler.   In the video, she states,

> **"Alright, so they breached the Capitol."**

> **"Pence refused to hear the objections, and now we surrounded the Capitol building.   This is nuts."**

---

[3] That friend is Andrew Yavoich, who was recently sentenced in another January 6th case to 6 months probation on one count of Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).   *United States v. Yavoich*, Case No. 23-cr-00216 (ACR)

(Image 1: Exhibit 1 at :07)



*Image 1*

When Montoni reached the Capitol building, she ascended the stairs adjacent to the scaffolding and ended up in the Northwest courtyard of the Upper West Terrace.   Montoni entered the Capitol building through a door off the Northwest Courtyard which she had witnessed being breached. Montoni then entered a hallway of the Capitol called the Brumidi Corridor.   When police officers tried to stop the rioters' forward progress through the Brumidi Corridor, she joined with other

5

rioters in an effort to push against those officers.   She shouted, "We paid for this!", and then joined the crowd in chanting "U.S.A." repeatedly.   She encouraged the other rioters, yelling, "Push back! Push back!"   (Exhibit 1 at :31)   Montoni witnessed other rioters ahead of her reacting to the effects of being pepper sprayed by police trying to defend themselves.   She saw them urgently jockeying through the crowd, saying "clear a path," rubbing their eyes, and asking for water. (Image 2: Exhibit 2 at :09); (Image 3: Exhibit 2 at 1:05)



*Image 2 (officers framed in red)*



*Image 3 (rioters reacting to spray)*

After spraying the rioters, the outnumbered and overwhelmed handful of officers appeared to retreat further into the building.

Montoni was not deterred by the prospect of getting sprayed.   She later moved from the lobby next to the Senate Wing Door towards the Crypt, stopping to enter what she called a "fancy

room"[4], and took a picture of the view out the window, which she posted in connection with the

following message:

> **"Here's a pretty little view from inside the Capitol at our traitor DC police, with a smashed window."**
>
> **"Congratulations to them, they got both sides to hate them."**

(Image 4)



*Image 4*

She also walked up behind a police officer and place a sticker on his back that said, "Fuck

Antifa."

She then proceeded down the hallway and entered the Crypt.   (Images 5, 6) [5]

---

[4] This was most likely a Senate conference room.
[5] Image 5 is a screenshot from an open-source video from Parler Story by Pro Publica at
https://d2hxwnssq7ss7g.cloudfront.net/LQN0zyD01D3i_cvt.mp4 (at 3:09), and Image 6 is a
screenshot from an open-source video from Parler Story by Pro Publica at



*Image 5 (Montoni in hallway)*



https://d2hxwnssq7ss7g.cloudfront.net/NYRHCOsbj0bi_cvt.mp4 (at 2:09)

*Image 6   (Montoni in Crypt)*

When Montoni heard from other rioters that reinforcements were coming to help the police, she made her way back to the Senate Wing Door and exited at approximately 3:14 pm.   Despite her awareness that she was not allowed to be inside the building, and that police were attempting to get rioters to leave, she nevertheless *re-entered* the building at about 3:28 pm.   (Image 7) [6]



*Image 7 (Montoni circled)*

Montoni was inside the building for only a couple of minutes the second time before leaving again.   It is estimated that she was in the building for less than 15 minutes in total.

### c.   Montoni's Posts on January 6th

While inside the Capitol building, Montoni posted a selfie video to her Instagram account in which she said,

---

[6]  Image 7 is a screenshot from CCTV security video.

> **"We're in the Capitol cuz this is our house – we paid for this, and they're trying to steal it from us.   Let's go!"**

(Exhibit 3)

She posted on her Parler account these statements:

> **WE BREACHED THE CAPITOL OMG**
>
> **"Insurrection is coming.   Hold the line.   Stay vigilant."**
>
> **"Storming the Capitol to take back our country from traitors! This is OUR HOUSEEEE!"**

Also on January 6th, she commented on her motivations, saying on Parler,

> **"We do not want civilians. We do not even want most of the cops. We want the TRAITOR POLITICIANS. This is not a civil war. This is a revolution."**

Again, on January 6th, but after the riot, when another user asked if she had broken in (to the

building) or, instead, had just gone into the halls to protest peacefully, Montoni admitted her

awareness that the rioters had broken into the Capitol:

> **"Obv broke in because it was locked. They had to breach the gates"**

Despite all that had happened at the Capitol on January 6th, Montoni took to social media

again on January 7th.   She did not consider the insurrection to be over.   She stated on Parler,

> **"How so? Traitors still occupy our federal buildings. We didn't win yet."**

In a private chat, she had the following interaction with a Facebook friend,

> **Author** Corinne Montoni (Facebook: ███████)
>
> **Sent** 2021-01-07 19:56:58 UTC
>
> **Body** I'm in the airport and I am one pissed off american
>
> **Author** ███████ (Facebook: ███████████)
>
> **Sent** 2021-01-07 19:57:13 UTC

11

**Body** Same. It's over

**Author** Corinne Montoni (Facebook: ████████)

**Sent** 2021-01-07 19:57:19 UTC

**Body** No it's just begun

### d.  Montoni's Posts After January 6th

In the days following January 6th, Montoni bragged about her involvement in the riot and sought recognition for having been at *and in* the riot.   In a private chat on January 7th, she told a Facebook contact,

> **"Hahah yeah it was so fun. But they did pepper spray us.   Andy [Yavoich] got it directly in the eye."**

She also expressed anger toward Vice President Pence in a Facebook chat:

> Corinne Montoni (Facebook: ████████)
>
> **Sent** 2021-01-07 21:35:21 UTC
>
> **Body** Yep he's first
>
> **Author** Corinne Montoni (Facebook: ████████)
>
> **Sent** 2021-01-07 21:35:29 UTC
>
> **Body** I was screaming that at the Capitol
>
> **Author** Corinne Montoni (Facebook: ████████)
>
> **Sent** 2021-01-07 21:35:32 UTC
>
> **Body** We want pence first

When one Facebook user suggested that the conduct of the mob on January 6th was illegal, Montoni became defiant.   One exchange unfolded as follows:

> **Author** ████████ (Facebook: ████████)
>
> **Sent** 2021-01-07 14:57:02 UTC
>
> **Body** Storming the capital and removing the American flag is LITERALLY an act of terrorism. This is not an accomplishment
>
> **Author** Corinne Montoni (Facebook: ████████)

12

**Sent** 2021-01-07 14:58:05 UTC

**Body** Lmao ok tell that to George Washington in 1775. Our rights were stolen and no one is doing anything about it.

**Author** Corinne Montoni (Facebook: ███████)

**Sent** 2021-01-07 14:58:31 UTC

**Body** Maybe we should have gone to a Walmart and looted and burned down some churches instead

**Author** Corinne Montoni (Facebook: ███████)

**Sent** 2021-01-07 14:58:37 UTC

**Body** Like BLM

On January 8th, she complained of being abandoned and betrayed by her leaders during the riot. She remarked that Jones had claimed he was the "leader of the resistance", and that he and others had been "screaming 1776 for the last three months" but that, on January 6th, while she was "on the front line," Jones "was cowering in his hotel room." But, recognizing her own culpability, she next asked if she would be arrested.

Montoni became increasingly concerned about the consequences of her criminal conduct. In private chat conversations, she discussed deleting her social media accounts. On January 9th and 13th, she did just that.

On September 9, 2021, six months after her arrest, Montoni agreed to be interviewed by law enforcement in the presence of her attorney. She admitted having seen rioters break windows and doors. She admitted having entered the Capitol, going to the Crypt, and entering a "fancy room" off the corridor leading to the Crypt. She admitted pushing against the officers along with the crowd. She admitted being aware that the police were using pepper spray against the rioters. She admitted placing the sticker on the officer's back.

She admitted writing all the posts. However, she claimed that he were meant to be "jokes"

13

and merely intended to gain comments and followers.

### III.    THE CHARGES AND PLEA AGREEMENT

On June 26, 2023, Montoni pleaded guilty pursuant to a written plea agreement to a one-count Information charging her with Civil Disorder in violation of 18 U.S.C. §231(a)(3).

### IV.    STATUTORY PENALTIES

Montoni now faces sentencing on one Count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As the parties and the Probation Office agree, the Guidelines analysis for this matter follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)(2)) | 10 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | - 2 |
| **Total Adjusted Offense Level:** | **8** |

*See* Plea Agreement at ¶ 5(A).

The U.S. Probation Officer calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 50. Accordingly, based on both the Probation Officer's and the parties'

calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, Montoni's Guidelines imprisonment range is 0 to 6 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Montoni's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, thwarting the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Montoni encouraged other rioters and personally participated in the rioters' push against police officers trying to defend the Capitol building.   Before, during, and after January 6th, she advocated for violent insurrection and retribution against any members of Congress who were unwilling to halt the certification of the electoral vote in order to keep Donald Trump as president.   The nature and circumstances of Montoni's offense was serious, and fully support the government's recommended sentence of 3 months.

### B.  The History and Characteristics of the Defendant

Montoni has no criminal history or history of substance abuse.   She has also been mostly compliant with the conditions of her bond.   Despite a difficult childhood, she overcame her situation, graduated from college and, though unemployed, volunteers with charitable organizations   in her community.   There is no indication that she has ever been involved in violent activity prior to January 6th.

However, Montoni's social media posts demonstrate a willingness to latch onto extreme

15

ideologies and advocate violence.   Her involvement in the events of January 6th  was not so much an aberration as a culmination of months of escalating rhetoric.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Montoni's criminal conduct on January 6 was the epitome of disrespect for the law.

To view Montoni's conduct as mere trespass is to disregard the gravity of the situation to which she enthusiastically contributed.   See *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building.  What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs in favor of a sentence of incarceration.

Montoni expressed a willingness to accept responsibility at an early stage of the investigation and has expressed remorse for her actions – both at the plea hearing and in her statement to the Probation Officer.   PSR ¶ 36.   It may be that she is truly remorseful and contrite at this time.   If so, it is to be acknowledged and credited by the Court.

Notably, however, her remorse did not come until after she was facing the consequences of her actions.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Indeed, her social media posts in the aftermath of the riot showed no indication of remorse. They were consistent in content and tone with what she was saying *before* and *during* the riot. She had no qualms and no regrets.   She was proud what the rioters had accomplished, and she was eager to claim the "cred" that came with having been personally involved in the events of January 6th.   Far from being ashamed, she indignantly defended the propriety of her actions. Moreover, while she voluntarily submitted to a debrief interview, she also absurdly suggested that her vitriolic statements on social media were meant to be jokes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United*

*States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

18

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Derrick Evans*, Case No. 21-cr-00337 (RCL).   Like Montoni, Evans did not personally engage in any combat or other violence at the Capitol.   But, akin to Montoni, he made enthusiastic video recordings chronicling every step of the way in the process of storming the Capitol, including inside the building.   Like Montoni, he cheered other rioters and reveled in what was going on.   Similar to Montoni, he made statements endorsing the idea of violent insurrection.   He was convicted of one count of Civil Disorder, and this Court imposed a sentence of 3 months of imprisonment.

*United States v. Lewis Easton Cantwell*, Case No. 21-cr-00089 (EGS).   Like Montoni, Cantwell yelled and encouraged rioters battling police but did not personally engage in any direct combat with police.   He did, however, participate in "Heave Ho" pushing at that location and helped push a flagpole into the tunnel.   Like Montoni, he recorded himself making statements in support of the political violence taking place at the Capitol and a desire to get into the building.

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

And, like Montoni, he later minimized the seriousness of the riot and his role.   After his conviction

on two counts of Civil Disorder, the Court imposed a sentence of 5 months of imprisonment.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[10]   Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Montoni must pay $2,000 in restitution, which reflects in part

the role Montoni played in the riot on January 6.[11]   Plea Agreement at ¶ 11.   As the plea

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July, 2023.   *Id.*   (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)   Montoni's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.   *See* PSR ¶ 114.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[12]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.");

More specifically, the Court should require Montoni to pay $2,000 in restitution for his conviction.  This amount fairly reflects Montoni's role in the offense and the damages resulting from his conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

**VIII.   CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 3 months imprisonment, $2000 in restitution, and the mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY: _____
David J. Perri
Assistant United States Attorney

24